# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| CHANTE' HODGE,<br><br>     Plaintiff,<br><br>     v.<br><br>WALRUS OYSTER ALE HOUSE,<br>STAR RESTAURANT GROUP, LLC,<br>JASON FLEMING,<br>STUART R. DAMON,<br>KRISTOPHER S. CARR,<br>DESMOND J. REILLY,<br>WILLIAM GROBEN,<br>RACHEL BAROODY,<br>CAROL SEVILLA,<br>NICOLE BAUMGARTNER and<br>"DOE" RESTAURANT HOST,<br><br>     Defendants. | Civil Action No. TDC-18-3845 |

## MEMORANDUM OPINION

Plaintiff Chante' Hodge has filed a civil action against Defendants Walrus Oyster & Ale House, Star Restaurant Group, LLC, Jason Fleming, Stuart R. Damon, Kristopher S. Carr, Desmond J. Reilly, William Groben, Rachel Baroody, Carla Sevilla, Nicole Baumgartner, and Doe Restaurant Host (collectively, "Defendants"), alleging race and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (2012); 42 U.S.C. § 1981 ("Section 1981"); and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (2018). Pending before the Court are a Motion to Dismiss by all named Defendants other than Baumgartner and a separate Motion to Dismiss in which Baumgartner joins in the first Motion (collectively, "the Motions"). Having reviewed the filings, the Court finds that no hearing is

necessary. *See* D. Md. Local R. 105. 6. For the following reasons, the Motions to Dismiss are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Hodge, an African American woman, worked at the Walrus Oyster & Ale House ("Walrus Oyster House" or "the Restaurant") as a server from March 24, 2015 until her resignation on April 1, 2017. She turned 40 years old during her first year of employment. Walrus Oyster House, which opened in September 2014, is a restaurant located at National Harbor in Prince George's County, Maryland and is owned by Defendant Star Restaurant Group, LLC ("Star Restaurant Group"). The rest of Defendants were either owners of Walrus Oyster House or Star Restaurant Group, or were employed in a management position at Walrus Oyster House during Hodge's tenure there.

According to Hodge, she quickly showed herself to be an especially adept server, so much so that in May 2015 she was offered and accepted a position as a "Server Trainer," which required her to train the Restaurant's existing and incoming service staff. Compl. ¶¶ 50-55, ECF No. 1. Considering this position to be a stepping stone to a managerial role, Hodge then submitted a proposal that she be placed in a floor manager position. Defendant Stuart Damon, an owner and manager of Walrus Oyster House, denied Hodge her proposed managerial position, but he told her in the same time frame that she would be promoted to a higher position known as "Captain Server" or to a manager position as additional restaurants were opened. *Id.* ¶¶ 84-86.

Nevertheless, starting from Hodge's designation as a Server Trainer through the following year, Defendants filled several other managerial positions without offering them to Hodge. None of the individuals hired to fill these positions were African American. For example, in August 2016, Damon and Defendant Jason Fleming, the General Manager of Walrus Oyster House,

2

promoted to a supervisory position Taylor Blare, a 20-year-old white woman who was hired in July 2015 as a server and was trained by Hodge, even though Blare had not sought the promotion. Defendant Rachel Baroody, who was hired as a floor manager in 2016, had to ask Hodge on several occasions for work-related advice. Although it is unclear whether Hodge officially applied for these positions, she had previously expressed interest in being promoted to a managerial position. Nevertheless, none of these positions were offered to her, and they were apparently filled through an informal and opaque process.

Hodge also alleges that during her time at Walrus Oyster House, she was subjected to discrimination in how tables and customers were allocated to servers. She contends that from June 2016 to January 2017, she was repeatedly skipped in the seating rotation, meaning that a party of customers that should have been seated in her designated section in the Restaurant was instead seated in a white or Hispanic server's section. She further alleges that on some occasions tables in her designated section were allocated to white servers' sections, without any other tables being placed in Hodge's section to balance out the assignments. These practices of reducing the number of tables and customers allocated to Hodge, which reduced the amount of the tips she received, cut her overall earnings by as much as 25 percent. The servers who benefited from this unequal treatment in assigning customers and tables were both younger than Hodge and not African American.

Hodge also describes several other incidents that she claims further demonstrate Defendants' discrimination against her. One evening, she was forced to compensate Walrus Oyster House for a counterfeit $100 bill she had accepted, while less than a week later a white server was not forced to do so when she could not account for $70 in sales. On another occasion, on November 27, 2016, Fleming, who is white, "stalked" and "followed" Hodge around the

Restaurant, "watching everything she would do" and directing "hostile, hateful, evil, discriminatory and very angry looking expressions" at her. Compl. ¶ 111. That same day, Fleming threw out a carton of fresh grapes Hodge had purchased for herself and left in the storage room, even though he had allowed a non-African American employee to eat in the storage room around the same time. According to Hodge, Fleming maliciously threw out her personal food and drinks without justification on other occasions as well.

Hodge also alleges that on December 1, 2016, Walrus Oyster House management deliberately failed to assign her to work a lucrative, 200-person special event at the Restaurant. When another server arranged to have Hodge substitute for her that evening, Fleming and Damon refused to let Hodge take the shift. In January 2017, Hodge was again denied the opportunity to work an unfilled shift. That same month, Hodge's normal schedule was reduced to just two shifts a week, while the Restaurant's white servers were still scheduled for four or five shifts a week. Finally, she points to other instances in which African American employees were passed over for promotions or had their shifts changed. Hodge ultimately resigned from Walrus Oyster House on April 1, 2017.

Meanwhile, on December 5, 2016, Hodge sent a letter to the United States Equal Employment Opportunity Commission ("EEOC") detailing some of her complaints. She then filed an official EEOC charge of discrimination ("the EEOC Charge") on January 10, 2017. The EEOC Charge alleges that "[b]eginning in or about July 2015, and continuing, I have been subjected to unequal terms and conditions of employment based on my race (Black) and age (40). The unequal terms and conditions of employment have taken the form of being subjected to unfavorable treatment, skipped in assignment of guests, and denied equal and fair assignment of duties (seating

4

tables in my section)." EEOC Charge, Mot. Dismiss Ex. B, ECF No. 27-3. On September 27, 2018, the EEOC issued Hodge a right-to-sue letter.

On December 21, 2018, Hodge filed this action. Construed liberally, the Complaint asserts claims of: (1) discriminatory treatment on the basis of race and age, in violation of Title VII, Section 1981, and the ADEA; (2) failure to promote on the basis of race and age, in violation of Title VII, Section 1981, and the ADEA; (3) a racially hostile work environment, in violation of Title VII and Section 1981; (4) constructive discharge on the basis of race, in violation of Title VII and Section 1981; and (5) intentional infliction of emotional distress.

## DISCUSSION

In their Motions to Dismiss, Defendants seek dismissal of most, but not all, of Hodge's claims. Defendants argue that (1) Hodge's failure-to-promote claims must be dismissed because she failed to exhaust administrative remedies as to those claims; and (2) Hodge has not alleged sufficient facts to state plausible claims of discriminatory failure to promote, hostile work environment, constructive discharge, or intentional infliction of emotional distress. Notably, Defendants have not sought dismissal of Hodge's discriminatory treatment claims under Title VII, Section 1981, and the ADEA based on her allegations of discriminatory table assignments at Walrus Oyster House. Such claims, which allege discriminatory treatment in terms and conditions of employment that impacted Hodge's wages and earnings, will remain in the case regardless of the arguments asserted in the Motions. *See, e.g., Ray v. Int'l Paper Co.*, 909 F.3d 661, 670 (4th Cir. 2018) (holding that an employee who was prevented from working voluntary overtime shifts and thus lost "a significant part of [her] earnings" had suffered an adverse employment action for purposes of Title VII).

5

## I.    Legal Standards

Defendants move to dismiss Hodge's claims both for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). Defendants' jurisdictional argument is based on the claim that this Court lacks subject matter jurisdiction over Hodge's Title VII and ADEA failure-to-promote claims because Hodge did not exhaust administrative remedies by including these claims in her EEOC Charge. *See* 29 U.S.C. § 626(d)(1); 42 U.S.C. § 2000e-5(f)(1). After Defendants filed their brief, however, the United States Supreme Court held in *Fort Bend County v. Davis*, 139 S. Ct. 1843 (2019), that "Title VII's charge-filing instruction is not jurisdictional." *Id.* at 1846. In so ruling, the Court abrogated the prior holding of the United States Court of Appeals for the Fourth Circuit that Title VII's exhaustion requirement relating to the content of an EEOC charge was jurisdictional. *See id.*; *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300-01 (4th Cir. 2009), *abrogated by Fort Bend*, 139 S. Ct. 1843, 1846 (2019). Although *Jones* also held that the analogous ADEA exhaustion requirement was jurisdictional, *Jones*, 551 F.3d at 301, the reasoning of *Davis* applies equally to that provision and therefore compels the conclusion that it, too, is non-jurisdictional. *See Davis*, 139 S. Ct. at 1849-51; *see also Johnson v. Silver Diner, Inc.*, No. PWG-18-3021, 2019 WL 3717784, at *2 (D. Md. Aug. 7, 2019) (considering the exhaustion requirements of both Title VII and the ADEA under Rule 12(b)(6)). Rule 12(b)(1) is thus an improper vehicle through which to enforce the exhaustion requirements of both Title VII and the ADEA. The Court will instead treat Defendants' arguments regarding Hodge's purported failure to exhaust as raised under Rule 12(b)(6). *Cf. Stewart v. Iancu*, 912 F.3d 693, 701-02 (4th Cir. 2019) (holding that Title VII's 180-day waiting period is a non-jurisdictional, claim-processing rule that should be addressed under Rule 12(b)(6)).

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Ordinarily, on a motion to dismiss under Rule 12(b)(6), the Court may consider only the Complaint, its attachments, and documents integral to the Complaint. *See* Fed. R. Civ. P. 12(d); *Mason v. Machine Zone, Inc.*, 851 F.3d 315, 317 n.2 (4th Cir. 2017). In considering Defendants' claim of failure to exhaust administrative remedies, the Court will consider Hodge's EEOC Charge attached to the Motion, as it is integral to the complaint. *See White v. Mortgage Dynamics, Inc.*, 528 F. Supp. 2d 576, 579 (D. Md. 2007) (holding that an EEOC charge attached to a motion to dismiss could be considered because it was integral to the complaint and the plaintiff had not objected to its consideration). The Court will also consider Defendants' response to the EEOC Charge that was attached to Hodge's memorandum in opposition to the Motions, as Hodge referenced it in her Complaint and its authenticity is not in dispute. *See Walch v. Adjutant General's Dept. of Texas*, 533 F.3d 289, 293-94 (5th Cir. 2008) (holding that the court could consider exhibits attached to the plaintiff's opposition to the defendants' motion to dismiss because "[n]o party questions the authenticity of these two documents and both were sufficiently referenced in the complaint"); *cf. Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th

Cir. 2004) ("[W]e have held that when a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" (citation omitted)).

## II.    Discriminatory Failure to Promote

Hodge claims that Defendants failed to promote her because of race in violation of Title VII and Section 1981, and because of age in violation of the ADEA. Defendants counter that (1) Hodge failed to present this claim in her EEOC Charge and so is precluded from raising it under Title VII and the ADEA; and (2) even if Hodge properly exhausted administrative remedies, she has failed to allege sufficient facts to state a plausible claim for relief for discriminatory non-promotion.

### A.    Exhaustion of Administrative Remedies

Discrimination claims under both Title VII and the ADEA are subject to an administrative exhaustion requirement. *See* 29 U.S.C. § 626(d); 42 U.S.C. § 2000e-5(f)(1). Under both statutes, exhaustion demands that the plaintiff first file a charge with the EEOC. *See* 29 U.S.C. § 626(d); 42 U.S.C. § 2000e-5(f)(1). This EEOC charge "defines the scope of [the plaintiff's] subsequent right to institute a civil suit." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (citation omitted). If a plaintiff fails to include a claim in the EEOC charge, the plaintiff may later assert it in federal court only if it is "reasonably related to [the] EEOC charge and can be expected to follow from a reasonable administrative investigation." *Id.*

The Fourth Circuit has found that even where an EEOC charge and a subsequent federal court complaint allege distinct instances of mistreatment, they are nevertheless sufficiently related if the mistreatment constitutes the same type of discrimination at the hands of the same actor. *See,*

*e.g.*, *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 594-96 (4th Cir. 2012) (holding that, where an EEOC charge and subsequent federal court complaint both alleged discrimination on the basis of disability because the plaintiff was denied a reasonable accommodation, the exhaustion requirement was satisfied even though the plaintiff raised different specific reasonable accommodations in the two documents); *Smith*, 202 F.3d at 248 ("Both Smith's Complaint and her EEOC charge allege retaliatory actions by First Union's management because of her complaints about Scoggins. We therefore can analyze the merits of Smith's retaliation claim."). By contrast, the Fourth Circuit has concluded that where the allegations in the EEOC charge and the federal court complaint differ in terms of the alleged discriminatory actor, the type of discriminatory conduct, and the relevant time period, the newly stated claim has not been exhausted. *See Chacko v. Patuxent Inst.*, 429 F.3d 505, 510-13 (4th Cir. 2005) (holding that the plaintiff had failed to exhaust where the EEOC charge alleged three specific instances of harassment by a supervisor and the federal court complaint alleged long-term harassment by colleagues). "A claim will also be typically barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits." *Id.* at 509.

Against this backdrop, the Court cannot find that the failure-to-promote claims Hodge asserts in her Complaint are reasonably related to the discriminatory treatment claims she made in her EEOC Charge. *See id.* In *Dennis v. County of Fairfax*, 55 F.3d 151 (4th Cir. 1995), the plaintiff had filed an EEOC charge alleging that he was subjected to "disparate disciplinary treatment" at work after an incident with a white co-worker. *Id.* at 153. In his subsequent federal lawsuit, he alleged "traditional claims of discrimination in hiring, promotion, and training." *Id.* at 156. The court held that, to the extent that these claims were brought under Title VII, the plaintiff had failed

to exhaust them because they "exceed[ed] the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof." *Id.* Similarly, in her EEOC Charge, Hodge complained only of disparate treatment in table assignments, describing how "[t]he unequal terms and conditions of employment have taken the form of being subjected to unfavorable treatment, skipped in assignment of guests, and denied equal and fair assignment of duties (seating tables in my section)." EEOC Charge at 1. She first broached the distinct issue of promotions in the Complaint initiating this case. As in *Dennis*, the Court finds that a claim of discrimination in one aspect of the employment relationship is not reasonably related to a claim of discrimination in a distinctly separate aspect of the employment relationship. *See Dennis*, 55 F.3d at 156; *Chacko*, 429 F.3d at 509.

This conclusion is bolstered by the fact that Hodge's EEOC Charge failed to put Defendants on notice of her discriminatory non-promotion claims. "To determine that a judicial complaint is reasonably related to an EEOC complaint, the court must find that the defendant had sufficient notice from the administrative charge of the alleged kinds of discrimination." *McGaw v. Biovail Pharmaceuticals, Inc.*, 300 F. Supp. 2d 371, 373 (D. Md. 2004); *see also Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 526 (7th Cir. 2008) (holding that claims raised in federal court were not reasonably related to those raised in a EEOC charge in part because "the allegations in the plaintiffs' EEOC charges were not enough to put American Airlines on notice" of the subsequent claims). Here, Defendants appear to have been entirely unaware of Hodge's complaints regarding discriminatory non-promotion. In their written response to the EEOC Charge, Defendants focused exclusively on issues relating to Hodge's table assignments and made no mention of promotions. To be sure, employers do not need to respond to allegations for them to be deemed exhausted. *Cf. Smith v. Cheyenne Retirement Investors L.P.*, 904 F.3d 1159, 1165 (10th Cir. 2018) ("We have

consistently held, time and again, that the reasonable and likely scope of the investigation is determined by the allegations contained in the [EEOC] Charge itself, rather than in the Charge and any responsive documents." (citations omitted)). Nevertheless, in assessing whether charges of discriminatory table assignments are reasonably related to charges of discriminatory non-promotion, the lack of any basis to conclude that the EEOC Charge provided notice to Defendants of Hodge's failure-to-promote claims provides further support for the conclusion that Hodge did not exhaust administrative remedies on such claims.

Because Hodge failed to exhaust as to her failure-to-promote claims under Title VII and the ADEA, the Court will grant Defendants' Motions as to those claims. However, a claim of race discrimination relating to non-promotion may also be brought under Section 1981. *See, e.g.*, *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004) (listing the elements of a *prima facie* case for a Section 1981 failure-to-promote claim). Section 1981 contains no exhaustion requirement. *See* 42 U.S.C. § 1981; *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 460-61 (1975). Thus, Hodge's failure to exhaust her discriminatory non-promotion claims under Title VII and the ADEA does not preclude her from advancing such a claim under Section 1981. The Court therefore must assess the sufficiency of the allegations underlying this claim.

### B.  Sufficiency of Allegations

In her Complaint, Hodge alleges that, despite her stellar job performance, she was passed over for promotions several times on the basis of race, in violation of Section 1981. Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The statute defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). To state a claim under Section 1981, a plaintiff must establish "purposeful, racially discriminatory actions that affect at least one of the contractual aspects listed in § 1981(b)." *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir. 1999). The substantive elements of a *prima facie* case of employment discrimination under Section 1981 are the same as for a claim brought under Title VII. *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 133 n.7 (4th Cir. 2002); *Sewell v. Strayer Univ.*, 956 F. Supp. 2d 658, 673 (D. Md. 2013).

In order for Hodge to establish a *prima facie* case of discrimination based on a failure to promote, she must show that: (1) she is a member of a protected class; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position "under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Although it is not strictly necessary for a plaintiff to establish all elements of a *prima facie* case in the complaint, a plaintiff must allege sufficient facts to support a plausible inference of discrimination and thereby raise a right to relief above the speculative level. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

As an African American, Hodge satisfies the first requirement. *See Williams v. Staples, Inc.*, 372 F.3d 662, 668 (4th Cir. 2004). She has also provided allegations sufficient to satisfy the third requirement: she alleges that she "would have been able to perform the duties of a floor manager or assistan[t] manager, [or] even a General Manager." Compl. ¶ 66. To substantiate this

claim, she points to her mental acuity, her 15 years of experience in the restaurant industry, and her customer service abilities. Moreover, she alleges that the tasks she was already handling as a Server Trainer were "things Floor Managers and General Managers would do in the restaurant field." *Id.* ¶ 67. Particularly where Defendants do not challenge Hodge's qualifications, her allegations on this point are sufficient at this stage of the litigation.

The other two elements of a *prima facie* case are contested. On the second requirement, Defendants argue that Hodge's allegations cannot give rise to a discriminatory non-promotion claim because she has failed to allege that she applied for the promotions in question. Defendants are correct that this is usually a requirement. *See Brown*, 159 F.3d at 902. However, the Fourth Circuit has held that where the promotional system is less than formal and transparent, plaintiffs need not necessarily allege that they applied for the promotion at issue. *See Williams v. Giant Food Inc.*, 370 F.3d 423, 431 (4th Cir. 2004). "[I]f the employer fails to make its employees aware of vacancies, the application requirement may be relaxed and the employee treated as if she had actually applied for a specific position." *Id.* Here, the Complaint, construed in the light most favorable to Hodge, supports the conclusion that the promotions of white employees described by Hodge were accomplished without a formal application process open to all qualified candidates. Rather, as described by Hodge, several assistant manager or floor manager positions were filled without Hodge receiving the opportunity to be considered for them, even though she had expressed an interest in a promotion and had been told by Damon that she would be promoted. For example, Taylor Blare, a 20-year-old white woman who had been trained by Hodge, was offered a supervisory position even though "she did not initially ask for the position." Compl. ¶ 75. Hodge's assertion that the promotion came as a shock to her illustrates that the promotion process was not open and transparent. *Id.* ¶ 73. This informal promotional system is also demonstrated by Hodge's

description of her own advancement to Server Trainer, a position to which she did not apply but which was instead offered to her. In such an informal and opaque system, Hodge need not demonstrate that she applied to a particular position in order to establish a *prima facie* case. *See Williams*, 370 F.3d at 431.

Defendants also challenge the fourth requirement of a *prima facie* case, arguing that Hodge has not pleaded "a fact-based nexus between Defendants' decision to hire individuals other than her for the positions in question and Defendants' purported bias against Plaintiff's race." Mot. Dismiss at 10, ECF No. 27-1. This requirement, however, is satisfied by an allegation that the person who was actually promoted was not a member of the protected class to which the plaintiff belongs. *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1129-30 (4th Cir. 1995). Hodge is African American, while all of those she claims were discriminatorily promoted are not. Hodge has therefore satisfied this requirement and, more broadly, all of the elements of a *prima facie* case of a discriminatory failure-to-promote claim under Section 1981. The Court will therefore deny the Motions on this claim.

### III. Hostile Work Environment

While Hodge does not include a separate hostile work environment count in her Complaint, she alleges that Defendants created a hostile work environment in a count entitled "Deprivation of Title VII of the Civil Rights Act of 1964" and in another count entitled "42 U.S.C. Code Section 1981." Construing her self-represented complaint liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the Court reads the Complaint as alleging that Defendants created a hostile work environment in violation of Title VII and Section 1981.

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome harassment; (2) the harassment was based on the plaintiff's race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baquir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006). A court's determination whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[C]allous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), in contrast, do not rise to the level of actionable harassment.

Here, Hodge's hostile work environment claim is based in part on her allegations that she was subjected to discrimination in table assignments and that she was denied promotions in favor of white employees. Even if Hodge considered these actions to be hostile and malicious, her allegations about these standard forms of discrimination, which will be addressed through her other claims, do not include the type of intimidation, ridicule, and insulting conduct that typically form the basis of a hostile work environment claim. *See Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult." (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S.

101, 115 (2002))); *see also Robertson v. Dodaro*, 767 F. Supp. 2d 185, 200 (D.D.C. 2011) ("The plaintiff cannot . . . simply bootstrap her claims of disparate treatment in an effort to create a hostile work environment claim.").

Beyond these allegations, Hodge's hostile work environment claim relies on her assertions that Fleming threw out Hodge's food or drinks on several occasions and that on one occasion, Fleming followed Hodge around the Restaurant, watching her every move, with an angry and hostile facial expression. Such allegations do not describe harassment severe or pervasive enough to support a hostile work environment claim. Hodge alleges no explicitly or implicitly racially derogatory language or actions and has identified no abusive communication or even raised voices in any of these instances. *See Boyer-Liberto*, 786 F.3d at 279-80 (finding sufficient evidence to support a hostile work environment claim where the African American plaintiff was called a "porch monkey" several times over a two-day period). Although a single incident of racial harassment can establish a hostile work environment, the one person-to-person incident she alleges—Fleming following her around the restaurant with an angry facial expression—is not the kind of racially derogatory or physically threatening behavior that courts have found to support a hostile work environment claim. *See id.* (holding that a *de facto* supervisor's threats to "get" the plaintiff and to "make [the plaintiff] sorry," combined with the use of a racial epithet, were of the "particular threatening character" that could support a hostile work environment claim); *Smith*, 202 F.3d at 239, 243 (finding sufficient evidence to support a hostile work environment claim based on sex where a supervisor repeatedly made sexually derogatory remarks, "physically threatened" the plaintiff repeatedly, "often concluded his orders to plaintiff by saying 'or else you'll see what will happen to you,'" and threatened to kill her because of her gender when he told her, with threatening gestures, that he "could see why a man would slit a woman's throat"). Indeed,

courts have declined to find a hostile work environment based on workplace conduct far more severe than that alleged here. *See, e.g., Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (stating that allegations of a supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harping on a mistake" by the plaintiff, "making snide comments" to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" the plaintiff's use of leave and lack of compliance with directives fall "far short of being severe or pervasive enough to establish an abusive environment" (internal alterations omitted)). The Court will therefore grant the Motions as to Hodge's claim of a hostile work environment under Title VII and Section 1981.

## IV.     Constructive Discharge

Hodge also alleges that her resignation was compelled by Defendants' discriminatory actions and thus constituted a constructive discharge. Reading the Complaint liberally, the Court construes Hodge as asserting a claim of constructive discharge under Title VII and Section 1981 based on the allegedly unfair table assignments, the failure to promote Hodge, Fleming throwing away Hodge's food and drinks, Fleming following Hodge around the Restaurant, and the reduction of Hodge's shifts.

A claim of discriminatory constructive discharge arises when an employee resigns because the "circumstances of discrimination" were "so intolerable that a reasonable person would resign," such that a court will treat the "resignation as though the employer actually fired" the employee. *Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016). Thus, the test is "objective intolerability," not "deliberateness, or a subjective intent to force a resignation." *EEOC v. Consol. Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (quoting *Green*, 136 S. Ct. at 1779). Defendants argue that

"Plaintiff's Complaint falls far short of alleging conditions that rise to the level of 'objectively intolerable'" because, in their view, the incidents that Hodge complains of are "isolated and innocuous." Mot. Dismiss at 12, ECF No. 27-1. Without agreeing that the alleged conduct was innocuous, the Court finds that, for the same reasons that it has concluded that the allegations do not support a hostile work environment claim, they are also insufficient to state a plausible constructive discharge claim. See *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (holding that for a constructive discharge claim, "the plaintiff must show 'something more' than the showing required for a hostile work environment claim" (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004))).

Notably, however, the Supreme Court has stated that a claim of "constructive discharge resulting from . . . 'hostile work environment'" is only "one subset of Title VII constructive discharge claims." *Penn. State Police v. Suders*, 542 U.S. 129, 143 (2004). Courts have recognized that plaintiffs can instead establish a constructive discharge claim by showing that, without regard to the hostility of the work environment, the "employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the employee resigns." *EEOC v. Univ. of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir. 2002); *see also Burks v. Okla. Pub. Co.*, 81 F.3d 975, 978 (10th Cir. 1996) ("This court has recognized that an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired.").

Nevertheless, Hodge's allegations do not state a claim of constructive discharge under this alternate theory. The touchstone of this theory has been whether the anticipated termination is clear and imminent. In *University of Chicago Hospitals*, for example, the plaintiff arrived at work one morning to find that her belongings had been packed up and her office was being used for

18

storage. 276 F.3d at 332. In conjunction with a supervisor's comment that one of the plaintiff's mistakes had been "the last straw," the court held that this evidence was sufficient to defeat the employer's summary judgment motion. *Id.* at 332-33; *see also Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 494, 502 (7th Cir. 2010) (holding that plaintiff was constructively discharged where he was handed a resignation letter and told that if he did not sign it, he would be terminated immediately). By contrast, courts have rejected constructive discharge claims where a plaintiff's termination was less than certain. In another case, the court held that the initiation of—and the plaintiff's refusal to submit to—a fitness-for-duty examination did not make termination imminent, even though the plaintiff submitted evidence that employees failing these tests were typically fired. *Wright v. Illinois Department of Children and Family Services*, 798 F.3d 513, 530-31 (7th Cir. 2015). Likewise, Hodge has not provided allegations supporting the conclusion that termination was imminent. The unequal table arrangements had been ongoing for over a year by the time she resigned. So had the promotions of white employees that she claims should have gone to her. While her hours and shifts had recently been reduced to two days a week, even if such reductions suggested that management was hoping she would quit, they do not show that she was about to be fired. As Hodge has failed to allege facts supporting a conclusion that her termination was imminent, the Court will grant the Motions as to the constructive discharge claim.

**V.    Intentional Infliction of Emotional Distress**

Hodge also alleges that Defendants' conduct amounts to intentional infliction of emotional distress. To state a claim for intentional infliction of emotional distress ("IIED") under Maryland law, a plaintiff must show (1) intentional or reckless conduct; (2) that was extreme and outrageous; (3) the plaintiff suffered severe emotional distress; and (4) there was a causal connection between the conduct and the emotional distress. *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977).

19

The Complaint does not allege sufficient facts to meet the second element. A defendant is liable for IIED only if the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 614 (quoting Restatement (Second) of Torts § 46 cmt. d (Am. Law Inst. 1965)); *see, e.g.*, *B.N. v. K.K.*, 538 A.2d 1175, 1181 (Md. 1988) (stating that "[o]ne who knowingly engages in conduct that is highly likely to infect another with an incurable disease of this nature, and who also is aware of the nature of the disease" has engaged in conduct meeting the standard for IIED); *Reagan v. Rider*, 521 A.2d 1246, 1251 (Md. Ct. Spec. App. 1987) (affirming a jury verdict of IIED against the plaintiff's stepfather, who had engaged in sexual abuse of the plaintiff during six years of her childhood). The Defendants' alleged actions of skipping Hodge in table assignments, failing to promote her, throwing out her food, and following her around the Restaurant on one occasion, fall short of atrocious, extreme, or intolerable activity. *See, e.g.*, *Beye v. Bureau of Nat'l Affairs*, 477 A.2d 1197, 1204-05 (Md. Ct. Spec. App. 1984) (holding that allegations that the plaintiff's supervisors gave him poor performance ratings, threatened to fire him, harassed him, physically assaulted him, passed him over for promotion, and deceived him into resigning were not sufficient to state an IIED claim). Moreover, Hodge has alleged no facts that would support the conclusion that her emotional distress was "so severe that no reasonable [person] could be expected to endure it." *Harris*, 380 A.2d at 616. Accordingly, the Court will grant the Defendants' Motion as to Count VI and dismiss the IIED claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED IN PART and

DENIED IN PART. A separate Order shall issue.

Date: November 15, 2019

THEODORE D. CHUANG
United States District Judge